**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

VIDEOLABS, INC.

      Plaintiff,

      v.

MOTOROLA SOLUTIONS, INC.,

      Defendant.

Civil Action No.:  2:26-cv-00232

**<u>JURY TRIAL DEMANDED</u>**

**<u>COMPLAINT FOR PATENT INFRINGEMENT</u>**

Plaintiff VideoLabs, Inc. ("VideoLabs" or "Plaintiff") through its attorneys, for its Complaint against Motorola Solutions, Inc., ("Defendant" or "MSI"), demands a trial by jury and alleges as follows:

**<u>INTRODUCTION</u>**

1. Digital video has become fundamental to how society interacts, communicates, educates, and entertains. In fact, video consumption now accounts for more than 82% of all Internet traffic.[1] The ability to reliably provide high-quality and secure video content drives the growth of digital platforms that are increasingly integral to the global economy.

2. The advent of high-quality video as a staple of digital consumption did not happen instantaneously. As with any complex technology, digital video presented implementation challenges. Many companies spent many years and resources to develop new and innovative

---

[1] *See The Sustainable Future of Video Entertainment*, INTERDIGITAL (Aug. 2020), https://www.interdigital.com/white_papers/the-sustainable-future-of-video-entertainment?submit_success=true.

technologies that guide how video is created, streamed, secured, managed, and consumed.

3.      Various inventions and technological advances have transformed digital video. Some of these technologies, such as techniques to efficiently compress video file size, address central challenges to storing and transmitting video. Others enable video content to be efficiently and securely streamed to the many user devices that exist today. Yet others involve managing and organizing videos to provide viewers easier access to content and address how they interact with content. Successful video streaming thus requires a myriad of technologies that necessarily coordinate with one another.

4.      Because various companies played roles in developing the foundational technology for today's digital video, no single company can provide the high-quality video experiences that consumers have come to expect without using technology owned by other companies. Companies wisely focus their innovation activities and R&D investments on developing unique products and services while relying on the sum total of all other industry investment in the various technologies that enable their products and services to work in the global, connected technology market.

5.      The founders of VideoLabs recognized this problem and understood that collective action was needed to address it. If the companies that developed critical video technologies worked together, everyone could benefit: all innovators could receive fair compensation for their contributions, companies deploying video technology could respect other innovators' patented technologies and license them on affordable and predictable terms, and consumers could experience better and more affordable video technology.

6.      In 2019, with support from widely recognized industry leaders, VideoLabs launched a platform to achieve these goals. VideoLabs spent millions of dollars and thousands of hours analyzing the video space and identifying the patents that reflect the innovations with the highest

impact. VideoLabs then compiled a portfolio of these core patents, obtaining them from leading companies, including Hewlett Packard Enterprise, Alcatel-Lucent S.A., Siemens AG, Swisscom AG, 3Com, Panasonic, LG, and Nokia.

7.      VideoLabs then opened-up participation in its platform to all willing companies. In exchange for low-cost membership or licensing fees, VideoLabs provides efficient access to its aggregated patent portfolio and a commitment to seek out the most important patents in the video industry and acquire them to the benefit of the industry. Many prominent companies recognized the benefits of the VideoLabs platform and worked with VideoLabs to efficiently and responsibly license its video technology patents.

8.      Today, VideoLabs' licensing platform has evolved and grown significantly from the early days. VideoLabs' primary focus continues to be serving patent implementers in the broader video industry by identifying, acquiring, aggregating, and licensing high-quality patents through its unique collective platform and providing companies flexible licensing structures (including membership) for more efficient licensing. VideoLabs has expanded its focus on serving patent innovators to provide them a better path to realize fair compensation for their patents. VideoLabs also works in partnership with patent owners by building and running independent licensing programs specifically focused on licensing the partner's patent portfolio as a service to them and the IP industry.

9.      To this day, VideoLabs continues to promote an efficient, respected, and balanced intellectual property environment where technology companies have predictable design freedom and innovators who contribute impactful patented inventions can obtain fair and just compensation. It has and continues to successfully bring on many patent owners, licensees and members to its efficient and equitable licensing platform. Equitable licensing dictates that all patent implementers accept their responsibility to license. When one (or many) peer company(ies) elects to holdout or refuses to

negotiate in good faith for a license to valid patents that are infringed and enforceable, it unfairly disadvantages those companies who chose to license responsibly.

10. Unfortunately, MSI has not worked responsibly to license VideoLabs' video technology patents despite being a provider of mission-critical communications, video security, and analytics for public safety and enterprise customers.

11. VideoLabs contacted MSI in June 2023 to offer MSI the benefit of VideoLabs' platform and to alert it to MSI's use of VideoLabs' patented technology. Despite the parties engaging in several licensing discussions, MSI refuses to take a license. Accordingly, VideoLabs felt that it had no recourse but to file an action to stop MSI's unauthorized use of VideoLabs' patents. Failure to take action would undermine the equity and viability of VideoLabs' licensing platform and permit further free riding by MSI of the significant innovations of VideoLabs' patents.

12. This case is ultimately about ensuring the integrity of the patent system and compensating patent owners for their protected innovations. Respect for intellectual property, as the law requires, is essential to incentivize innovation and promote technological progress. Accordingly, VideoLabs brings this action under the patent laws, 35 U.S.C. § 1 *et seq.*, in order to stop MSI's infringement of U.S. Patent Nos. 8,139,878, 7,970,059 and 8,208,542 (collectively, the "Asserted Patents").

## THE PARTIES

13. VideoLabs was founded in 2018 as part of an industry-sponsored and funded effort to reduce the cost and risk of technological gridlock associated with diverse patent ownership. VideoLabs' leadership has decades of experience in intellectual property licensing, during which they have completed over 1,000 intellectual property transactions worldwide and drawn more than $6 billion in revenue.

14.     VideoLabs is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.

15.     On information and belief Motorola Solutions, Inc. ("MSI") is a corporation duly organized and existing under the laws of the State of Delaware and maintains a place of business in this District at 415 East Exchange Parkway, Allen, Texas 75002 and 2910 Telecom Pkwy, Richardson, Texas 75082. MSI is registered to conduct business in the State of Texas and has a registered agent at CT Corp. System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

16.     On information and belief, MSI directly and/or indirectly develops, designs, manufactures, distributes, markets, offers for sale and/or sells infringing products and services in the United States, including in the Eastern District of Texas and otherwise directs infringing activities to this District in connection with its products and services.

## JURISDICTION AND VENUE

17.     This action arises under the patent laws of the United States, Title 35 of the United States Code. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

18.     This Court has personal jurisdiction over MSI in this action because MSI conducts business and continues to conduct business in Texas and MSI has committed and continues to commit acts of patent infringement in this District, by among other things, making, using, offering to sell and selling accused products in Texas and/or committing at least a portion of any other infringement alleged herein.

19.     Venue is proper in this District pursuant to at least 28 U.S.C. §1391 and §1400(b). Upon information and belief, MSI has conducted and continues to conduct business in this District and/or MSI has committed and continue to commit acts of patent infringement in this District.

## THE VIDEOLABS PATENTS-IN-SUIT

### A.    U.S. Patent No. 8,139,878

20.    On March 20, 2012, the United States Patent Office issued U.S. Patent No. 8,139,878, titled "Picture Coding Method And Picture Decoding Method" (the "'878 patent").  A true and correct copy of the '878 patent is attached hereto as Exhibit A.

21.    The '878 patent generally relates to video and audio coding. Video and audio coding refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques that minimize the size of the data that is sent between the encoder and the decoder by, e.g., removing redundancies and then efficiently representing the remaining data for transmission.

22.    The '878 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '878 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '878 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

23.    Encoding video content pursuant to the inventions of the '878 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

24.     The '878 patent describes breakthrough techniques for encoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods, and the core technology it describes has been used throughout the industry for years as the gold standard for coding video.

25.     In particular, the '878 patent is directed to encoding audio and video content. With respect to video, the '878 patent describes a type of coding called "Context-based Adaptive Variable Length Coding," or "CAVLC." *See, e.g.*, Ex. A at col. 1, ll. 49-52. Content encoded would then be stored or transmitted before ultimately being decoded for playback.

26.     When encoded, the image data in a particular image block is represented by, among other things, "coefficients." *Id.* at col. 1, ll. 63-67; col. 7, ll. 38-43; col. 21, ll. 60-66; col. 25, ll. 29-36. Larger coefficients for a block may indicate a larger amount of changes in that block as compared with a reference block. *See id.* For many blocks, there are no such changes, and so all the coefficients have a value of zero. *See id.* at col. 21, ll. 60-66. The inventors of the '878 patent recognized that these "zero-coefficient" blocks allow for compression. *See*, *e.g.*, *id.* at col. 1, ll. 49-52.

27.     The inventors of the '878 patent realized that the decoder did not need to know every single time a zero-coefficient block existed; rather, the decoder needs to know only when blocks have *non-zero* coefficients. They devised a technique wherein data about zero-coefficient blocks are effectively not encoded at all, and only non-zero coefficient block data is stored and transmitted. *See*, *e.g.*, *id.* at col. 1, ll.49-52, 56-62; col. 1, l. 65 – col. 2, l. 10. The inventors thereby achieved nearly perfect compression for these zero-coefficient blocks by communicating them practically without sending any information whatsoever. *See id.* at col. 2, ll.11-14.

28.     The inventors made substantial contributions to the efficiency of entropy coding. They recognized that the coefficients in neighboring blocks were a good predictor of the coefficients in the

block being analyzed, and so could be used to select the optimal coding table for the block, yielding enhanced compression. *See, e.g., id.* at col. 9, ll. 34-37; col. 13, ll. 4-11. The inventors disclosed using the same coding table for both inter- and intra-predictive coding, which was inefficient because there could be significant differences between neighboring blocks in the current frame and blocks in subsequent frames. *See, e.g., id.* at col. 1, ll. 33-38. Due to these limitations in the use of coding tables, compression efficiency in previously known entropy coding techniques would vary significantly between different types of content and generally decreased as the quality of content increased. *Id.* at col. 1, ll.39-44. These problems (and others) were overcome by the inventors of the '878 patent.

29.    The innovations of the '878 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '878 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[2]

**B.    U.S. Patent No. 7,970,059**

30.    On June 28, 2011, the United States Patent Office issued U.S. Patent No. 7,970,059, titled "Variable Length Coding Method and Variable Length Decoding Method" (the "'059 patent"). VideoLabs owns all rights and title to the '059 patent, as necessary to bring this action.  A true and correct copy of the '059 patent is attached hereto as Exhibit B.

31.    The '059 patent generally relates to video and audio coding. Video and audio coding

---

[2] *What is H264 Encoding?*, BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/Multimedia/What-is-H264-video-encoding/, at 2.

refers to both the encoding and decoding of video or audio content. Video and audio coding may include compression techniques to minimize the size of the data that is sent between the encoder and the decoder by removing redundancies and then efficiently representing the remaining data for transmission.

32.     The '059 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '059 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '059 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

33.     Encoding video content pursuant to the '059 patent allows the content to be made small for storage and transmission, while decoding permits the viewer to watch high-quality content on his or her device. In addition to making real-time streaming of content possible, every incremental increase in compression efficiency yields substantial benefits to companies that store, process, transmit or access video.

34.     The '059 patent describes breakthrough techniques for decoding audiovisual content so that it can be transmitted and stored with fewer resources. The patent vastly improves upon existing methods for coding video.

35.     In particular, the '059 patent is directed to decoding audio and video content. With respect to video, the '059 patent describes a type of coding called "Context-based Adaptive Binary Arithmetic Coding," or "CABAC," and the '059 patent describes using a plurality of probability

tables that are switched during the coding process. *See, e.g.*, Ex. B at 1:49-56.

36.     An arithmetic encoder converts a series of input signals into a representation that may be encoded as a single fractional number, which is communicated in the encoded bitstream. As a result, fewer or less common symbol values are represented using fewer or larger numbers of bits, which can lead to more effective compression than variable length coding.

37.     The innovations of the '059 patent provided a significant advance in compression that was recognized throughout the industry. In fact, the compression techniques of the '059 patent are used in the ubiquitous video codec, H.264. H.264 was revolutionary in the video industry, as it provided a quantum leap of improvement over the video codecs that had previously been commonly used, such as Motion JPEG video and MPEG-2. In particular, H.264 "has an 80% lower bitrate than Motion JPEG video" and "the bitrate savings can be as much as 50% or more compared to MPEG-2."[3]

### C.     U.S. Patent No. 8,208,542

38.     On June 26, 2012, the United States Patent Office issued U.S. Patent No. 8,208,542 (the "'542 patent"), titled "Moving Picture Coding Method and Moving Picture Decoding Method." VideoLabs owns all rights and title to the '542 patent, as necessary to bring this action. A true and correct copy of the '542 patent is attached hereto as Exhibit C.

39.     The '542 patent was developed by engineers at Panasonic, one of the largest consumer electronics companies at the time of the invention and a major innovator in Internet technologies. In 2002, when the patent application was first filed for the '542 patent, and as set forth in Panasonic's 2002 annual report, Panasonic was a world leader in digital video technologies. Panasonic developed

---

[3]     *What is H264 Encoding?*, BlackBox, https://www.blackbox.co.uk/gb-gb/page/38313/Resources/Technical-Resources/Black-Box-Explains/AV/What-is-H264-video-encoding/.

video coding technologies and designed consumer electronics, including TVs, DVD players and memory cards, for storing, processing and displaying video content. The inventions of the '542 patent are the result of years of research by Panasonic engineers at the cutting edge of video processing and coding.

40.     The '542 patent describes breakthrough techniques to provide a moving picture coding method and a moving picture decoding method for realizing an effective coding as well as a reduction of the processing burden when a plural reference picture interpolation prediction is performed.

41.     To address the drawbacks of prior art coding techniques, the inventors of the '542 patent created a novel moving picture coding and decoding method that codes/decodes each picture composing an input moving picture on a block-by-block basis and comprises a common reference picture determination step of determining a picture shared for reference among a plurality of blocks on which coding is performed with reference to a coded picture, a predictive image generation step of generating a predictive image using the common reference picture and a coding/decoding step of coding/decoding a current block to be coded/decoded using the predictive image. *See, e.g.*, Ex. C at 6:29-44.

42.     Accordingly, when the predictive image is generated using a reference picture, the processing burden can be reduced because the coding/decoding of the reference picture on a block-by-block basis is not necessary. *Id.*, at 6:45-50.

### FIRST COUNT

### (INFRINGEMENT OF U.S. PATENT NO. 8,139,878)

43.      VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

44.     VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the

'878 patent.

45.    On information and belief, MSI has directly infringed claim 1 of the '878 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '878 patent, including but not limited to the '878 patent Accused Instrumentalities, including the IndigoVision BX420 camera line, the Avigilon H5A camera line, the Pelco Spectra® Enhanced 7 Series cameras, as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

46.    The '878 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '878 patent. A claim chart comparing independent claim 1 of the '878 patent to representative Accused Instrumentalities is attached as Exhibit D.

47.    By having made, used, offered for sale, sold in the United States and/or imported into the United States and by continuing to make, use, sell, offer for sale in the United States and/or import into the United States the '878 patent Accused Instrumentalities, MSI has injured VideoLabs and is liable for infringement of the '878 patent pursuant to 35 U.S.C. § 271(a).

48.    MSI has been on notice of its infringement since at least June 19, 2023, when VideoLabs wrote to James Niewiara, Senior Vice President and General Counsel of MSI, and specifically informed MSI of its infringement of the '878 patent.

49.    MSI of course knows how its products operate, and on information and belief, upon receiving notice of the '878 patent, began investigating the '878 patent and its infringement. On information and belief, MSI either knowingly infringed the '878 patent or was willfully blind to its infringement — including by ignoring VideoLabs' communications and continuing to act in wanton disregard of VideoLabs' patent rights.

50.    Despite becoming aware of or willfully blinding itself to its infringement of the '878

-12-

patent, MSI continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, and use the '878 patent Accused Instrumentalities. On information and belief, MSI made no attempts to design around the '878 patent or otherwise stop its infringing behavior.

51.     MSI's infringement of the '878 patent therefore has been and continues to be willful.

52.     MSI also indirectly infringes the '878 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '878 patent Accused Instrumentalities in this District and throughout the United States. As described above, on information and belief, MSI has known about the '878 patent since at least June 19, 2023.

53.     On information and belief, MSI has actively induced the infringement of the '878 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '878 patent Accused Instrumentalities by third parties in the United States. MSI knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringed the '878 patent in violation of 35 U.S.C. § 271(a).

54.     MSI actively encourages third parties to directly infringe the '878 patent by, for example, marketing the '878 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, and/or operate the '878 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '878 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance to consumers during their continued use of the '878 patent Accused Instrumentalities and infringing functionalities.

55.     For example, MSI has induced and continues to induce third parties to infringe the '878 patent by encouraging and instructing them to, e.g., use the '878 patent Accused

Instrumentalities. As an example, MSI product documentation for its Avigilon line of IP Cameras, including the IP Camera Web Interface User Guide for Avigilon High Definition H4 and H5 IP Camera Models, Avigilon Multi-Head H4 and H5 IP Camera Models, Avigilon H4 and H5 Pro IP Camera Models, Avigilon H5A Fisheye IP Camera, and Avigilon H4 Video Intercom Camera instructs and encourages end users to configure the cameras to encode both audio and video content, and to utilize the H.264 compression codecs, in accordance with the '878 patented inventions.  For example, MSI instructs as follows: "On the Compression and Image Rate page, make sure the format is set to H.264 or H.265 to maximize the SD card recording capacity and performance," and "If you are using the Onboard Storage feature, select H.264 or H.265. For more information, see Enabling Onboard Storage on page 30."  *See* Avigilon IP Camera Web Interface User Guide, *available at* https://d8eqw8u9b6kgn.cloudfront.net/file_library/pdf/web-ui/avigilon-camera-web-interface-user-guide-en-v1.pdf, at 30, 23.  The same guide instructs and encourages activation and setup of audio coding.  *Id.* at 39-40.[4]  Similar instruction and encouragement is recited throughout MSI's product documentation, including documentation that was updated after receipt of notice regarding MSI's infringement of the '878 patent.  *See, e.g.*, Avigilon IP Camera Web Interface User Guide, Configuring Compression and Image Rate Settings, *at* https://docs.avigilon.com/bundle/ip-fixed-camera-web-interface/page/compression-and-image-rate/general-compression-image-rate-settings.htm (last updated March 16, 2026). MSI provides similar instruction and encouragement for its other products, such as its Pelco branded products.  For example, the Sarix Multi Enhanced Camera Operations Manual instructs: "On the Video Configurations page, make sure the format is set to H.264 or H.265 to maximize the SD card recording capacity and performance. See the section titled

---

[4]  Notably, MSI's encouragement to utilize H.265 also induces and contributes to the infringement of the '542 patent, asserted herein.

Compression and Image Rate." *See, e.g.*, https://www.pelco.com/fs/documents/pelco-sarix-multi-enhanced-operationsmanual-en-083023.pdf at 11; *id.* at 29. Users are instructed and encouraged to select an audio encoder, either Opus or G.711. *Id.* at 31.

56.    MSI actively and intentionally has encouraged and continues to encourage others to infringe the '878 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.*, No. 13-cv-365, 2014 WL2892285, *7 (W.D.Tex. May 12, 2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

57.    Additionally, the '878 patent Accused Instrumentalities during their normal and intended operation of encoding audiovisual content having H.264 data, infringed the '878 patent without any additional specific action of end users. By instructing and encouraging others to capture, encode, stream, and/or record content, MSI thus actively and intentionally encouraged and continues to encourage others to infringe the '878 patent.

58.    On information and belief, MSI contributorily infringed and continues to contributorily infringe the '878 patent under 35 U.S.C. § 271(c) by having imported, sold, and/or offered to sell and continuing to import, sell and offer to sell within the United States the '878 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the encoding codecs of the Accused Instrumentalities are material, have no substantial non-

infringing uses, and are known by MSI to be especially made or adapted for use in a manner that infringed the '878 patent.

59.    As a result of MSI's direct and indirect infringement of the '878 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for MSI's infringement, but in no event less than a reasonable royalty for the use made of the invention by MSI, together with interest and costs as fixed by the Court.

60.    On information and belief, despite having knowledge of the '878 patent and knowledge that it has directly and/or indirectly infringed the '878 patent, MSI nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. MSI's infringing activities relative to the '878 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

61.    MSI's acts of direct and indirect infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of MSI's wrongful acts in an amount to be proven at trial.

## SECOND COUNT

## (INFRINGEMENT OF U.S. PATENT NO. 7,970,059)

62.    VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

63.    VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the '059 patent.

-16-

64. On information and belief, MSI has directly infringed one or more claims of the '059 patent, including at least claim 3 of the '059 patent by, among other things, having made, used, sold, offered for sale, and/or imported into the United States products that embody one or more of the inventions claimed in the '059 patent, including but not limited to the '059 patent Accused Instrumentalities, including MSI devices with H.264 codecs that performed a method of decoding MPEG-2 and MPEG-4 video in accordance with H.264 standard (e.g., video appliances, cloud connectors and workstations), including, for example, the HD Video Appliance (Series 3), Pelco VideoXpert Shared Display, IndigoVision Large Enterprise NVR-AS, as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

65. The '059 patent Accused Instrumentalities satisfy all claim limitations of one or more claims of the '059 patent. A claim chart comparing exemplary independent claim 3 of the '059 patent to representative Accused Instrumentalities is attached as Exhibit E.

66. By having made, used, offered for sale, sold and/or imported into the United States the '059 patent Accused Instrumentalities, MSI has injured VideoLabs and is liable for infringement of the '059 patent pursuant to 35 U.S.C. § 271(a).

67. MSI's acts of direct infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of MSI's wrongful acts in an amount to be proven at trial.

## THIRD COUNT

### (INFRINGEMENT OF U.S. PATENT NO. 8,208,542)

68. VideoLabs incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

69. VideoLabs is the assignee and lawful owner of all right, title, and interest in and to the

'542 patent.

70.    On information and belief, MSI has directly infringed claim 1 of the '542 patent by, among other things, having made, used, sold, offered for sale in the United States and/or imported into the United States and by continuing to make, use, sell, offer for sale in the United States, and/or import into the United States products that embody one or more of the inventions claimed in the '542 patent, including but not limited to the '542 patent Accused Instrumentalities, including video cameras such as the Avigilon H5A Camera Line, Sarix IME Indoor and Environmental IR Domes, as well as all reasonably similar products, in violation of 35 U.S.C. § 271(a).

71.    The '542 patent Accused Instrumentalities satisfy all claim limitations of claim 1 of the '542 patent. A claim chart comparing independent claim 1 of the '542 patent to representative Accused Instrumentalities is attached as Exhibit F.

72.    By making, using, offering for sale, selling and/or importing into the United States the '542 patent Accused Instrumentalities, MSI has injured VideoLabs and is liable for infringement of the '542 patent pursuant to 35 U.S.C. § 271(a).

73.    MSI has been on notice of its infringement since at least June 19, 2023, when VideoLabs wrote to James Niewiara, Senior Vice President and General Counsel of MSI, and specifically informed MSI of its infringement of the '542 patent.

74.    MSI of course knows how its products operate, and on information and belief, upon receiving notice of the '542 patent, began investigating the '542 patent and its infringement. On information and belief, MSI either knowingly infringed the '542 patent or was willfully blind to its infringement — including by ignoring VideoLabs' communications and continuing to act in wanton disregard of VideoLabs' patent rights.

75.    Despite becoming aware of or willfully blinding itself to its infringement of the '542

patent, MSI continued to engage in and escalate its infringing activities by continuing to develop, advertise, make available, and use the '542 patent Accused Instrumentalities. On information and belief, MSI made no attempts to design around the '542 patent or otherwise stop its infringing behavior.

76. MSI's infringement of the '542 patent therefore has been willful.

77. MSI also indirectly infringed the '542 patent by inducing others to infringe and contributing to the infringement of others, including third-party users of the '542 patent Accused Instrumentalities in this District and throughout the United States. As described above, on information and belief, MSI has known about the '542 patent since at least June 19, 2023.

78. On information and belief, MSI has actively induced the infringement of the '542 patent under 35 U.S.C. § 271(b) by actively inducing the infringement of the '542 patent Accused Instrumentalities by third parties in the United States. MSI knew or was willfully blind to the fact that its conduct would induce these third parties to act in a manner that infringed the '542 patent in violation of 35 U.S.C. § 271(a).

79. MSI actively encouraged third parties to directly infringe the '542 patent by, for example, marketing the '542 patent Accused Instrumentalities and infringing functionalities to consumers; working with consumers to implement, and/or operate the '542 patent Accused Instrumentalities and infringing functionalities; fully supporting and managing consumers' continuing use of the '542 patent Accused Instrumentalities and infringing functionalities; and providing technical assistance to consumers during their continued use of the '542 patent Accused Instrumentalities and infringing functionalities.

80. For example, MSI induced third parties to infringe the '542 patent by encouraging and instructing them to, e.g., use the '542 patent Accused Instrumentalities. As an example, MSI product

documentation for its Avigilon line of IP Cameras, including the IP Camera Web Interface User Guide for Avigilon High Definition H4 and H5 IP Camera Models, Avigilon Multi-Head H4 and H5 IP Camera Models, Avigilon H4 and H5 Pro IP Camera Models, Avigilon H5A Fisheye IP Camera, and Avigilon H4 Video Intercom Camera instructs and encourages end users to configure the cameras to encode both audio and video content, and to utilize the H.264 compression codecs, in accordance with the '878 patented inventions.  For example, MSI instructs as follows: "On the Compression and Image Rate page, make sure the format is set to H.264 or H.265 to maximize the SD card recording capacity and performance," and "If you are using the Onboard Storage feature, select H.264 or H.265. For more information, see Enabling Onboard Storage on page 30."  *See* Avigilon IP Camera Web Interface User Guide, *available at* https://d8eqw8u9b6kgn.cloudfront.net/file_library/pdf/web-ui/avigilon-camera-web-interface-user-guide-en-v1.pdf, at 30, 23.  The same guide instructs and encourages activation and setup of audio coding.  *Id.* at 39-40.[5]  Similar instruction and encouragement is recited throughout MSI's product documentation, including documentation that was updated after receipt of notice regarding MSI's infringement of the '878 patent.  *See, e.g.*, Avigilon IP Camera Web Interface User Guide, Configuring Compression and Image Rate Settings, *at* https://docs.avigilon.com/bundle/ip-fixed-camera-web-interface/page/compression-and-image-rate/general-compression-image-rate-settings.htm (last updated March 16, 2026). MSI provides similar instruction and encouragement for its other products, such as its Pelco branded products.  For example, the Sarix Multi Enhanced Camera Operations Manual instructs: "On the Video Configurations page, make sure the format is set to H.264 or H.265 to maximize the SD card recording capacity and performance. See the section titled Compression and Image Rate."  *See, e.g.*,

---

[5]  Notably, MSI's encouragement to utilize H.264 also induces and contributes to the infringement of the '878 patent, asserted herein.

https://www.pelco.com/fs/documents/pelco-sarix-multi-enhanced-operationsmanual-en-083023.pdf

at 11; *id.* at 29. Users are instructed and encouraged to select an audio encoder, either Opus or G.711. *Id.* at 31.

81.     MSI actively and intentionally encouraged others to infringe the '542 patent. *See, e.g.*, *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (advertising or instructing an infringing use "show an affirmative intent that the product be used to infringe."); *Barry v. Medtronic, Inc.,* 914 F.3d 1310, 1334 (Fed. Cir. 2019) (advertising to customers and instructing them on how to engage in an infringing use satisfied the intent requirement); *Affinity Labs of Texas, LLC v. Toyota Motor North America.,* No. 13-cv-365, 2014 WL2892285, *7 (W.D.Tex. May 12, 2014) (intent satisfied where defendant provided "technical support and services, as well as detailed explanations, instructions and information as to arrangements, applications and uses" of accused products).

82.     Additionally, the '542 patent Accused Instrumentalities during their normal and intended operation of encoding audiovisual content having H.265 data, infringed the '542 patent without any additional specific action of end users. By instructing and encouraging others to capture, encode, stream, and/or record content, MSI thus actively and intentionally encouraged others to infringe the '542 patent.

83.     On information and belief, MSI contributorily infringed the '542 patent under 35 U.S.C. § 271(c) by having imported, sold, and/or offered to sell within the United States the '542 patent Accused Instrumentalities (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the encoding codecs of the Accused Instrumentalities are material, have no substantial non-infringing uses, and are known by MSI to be especially made or adapted for use in a manner that

infringed the '542 patent.

84.    As a result of MSI's direct and indirect infringement of the '542 patent, VideoLabs is entitled to monetary damages in an amount adequate to compensate for MSI's infringement, but in no event less than a reasonable royalty for the use made of the invention by MSI, together with interest and costs as fixed by the Court.

85.    On information and belief, despite having knowledge of the '542 patent and knowledge that it has directly and/or indirectly infringed the '542 patent, MSI nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. MSI's infringing activities relative to the '542 patent have been willful, wanton, malicious, deliberate, consciously wrongful, and an egregious case of misconduct beyond typical infringement such that VideoLabs is entitled to enhanced damages under 35 U.S.C. § 284 up to three times the amount found or assessed.

86.    MSI's acts of direct and indirect infringement have caused damage to VideoLabs. VideoLabs is entitled to damages in accordance with 35 U.S.C. §§ 271, 281, and 284 sustained as a result of MSI's wrongful acts in an amount to be proven at trial.

## PRAYER FOR RELIEF

VideoLabs respectfully requests that the Court find in favor of VideoLabs and against MSI, and the Court grant VideoLabs the following relief:

A.    For judgment that MSI is liable for infringement of one or more claims of the Asserted Patents, directly and/or indirectly, either literally and/or under the doctrine of equivalents;

B.    For judgment that MSI has willfully infringed one or more claims of the '878 patent and/or the '542 patent, directly and/or indirectly, either literally and/or under the doctrine of equivalents;

-22-

-23-

C.      For an accounting of all damages sustained by VideoLabs as the result of MSI's acts of infringement, including compensatory damages in an amount according to proof, and in no event less than a reasonable royalty;

D.      For a judgment and order requiring MSI to pay VideoLabs' damages, costs, expenses, and pre- and post-judgment interest for its infringement of the Asserted Patents as provided under 35 U.S.C. § 284;

E.      For a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to VideoLabs its reasonable attorneys' fees; and

F.      For such other and further relief in law and in equity as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, VideoLabs hereby demands a trial by jury of this action.

Dated: March 23, 2026

Respectfully submitted,

*/s/ M. Elizabeth Day*
M. Elizabeth Day
California Bar No. 177125
eday@bdiplaw.com
Marc Belloli
California Bar No. 244290
mbelloli@bdiplaw.com
Aaron R. Hand
California Bar No. 245755
ahand@bdiplaw.com
**BUNSOW DE MORY LLP**
701 El Camino Real,
Redwood City, CA 94063
Tel: (650) 351-7248
Fax: (415) 426-4744

*Attorneys for Plaintiff*
VIDEOLABS, INC.